THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DEMETRIOUS ARNOLD, Defendant-Appellee.

Second District  No. 2—07—0463

Opinion filed August 26, 2009.

ZENOFF, P.J., specially concurring.

John H. Vogt, State's Attorney, of Freeport (Lawrence M. Bauer and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Thomas A. Lilien and Bruce Kirkham, both of State Appellate Defender's Office, of Elgin, for appellee.

JUSTICE SCHOSTOK delivered the opinion of the court:

On November 10, 2006, after leaving his car and going into a store, the defendant, Demetrious Arnold, was arrested pursuant to a warrant that was later found to be invalid. Shortly after the arrest, a police officer searched his car and found cocaine and marijuana concealed in the ashtray. The defendant was charged with driving while his driver's license was revoked (625 ILCS 5/6—303(d) (West 2006)) and possession of a controlled substance with intent to deliver (720 ILCS 570/401(d) (West 2006)). The defendant moved to suppress the physical evidence, and the trial court granted the motion. We affirm.

## BACKGROUND

At the suppression hearing, police officer Aaron Dykema provided most of the testimony. Officer Dykema testified that he was a patrol officer, that he had worked for the Freeport police department for 7½ years, and that at the time of the arrest he had been assigned to the street crimes unit for seven or eight months. The street crimes unit investigates narcotics cases and other matters, and Officer Dykema usually worked alone in an unmarked police car.

On the date of the arrest, Officer Dykema was working alone in his unmarked squad car. At about 3 o'clock in the afternoon, he saw someone driving a brown Ford without license plates. He followed the car for three to four blocks, staying about 20 feet behind the car. At no point did he activate his flashing lights or siren. During that time, the car made sharp turns and accelerated rapidly, which made Officer Dykema think that the driver was trying to get away from him. The car turned left into a "Fast Stop" gas station. As the car was turning, Officer Dykema saw the defendant, who was driving, and recognized him from prior contacts. There were two other people in the car. After parking at a gas pump, the defendant got out of the car and went into the Fast Stop store located at the gas station.

Officer Dykema parked in a regular parking space in the gas station parking lot. At some point, Officer Dykema did not recall when, but probably while he was in the gas station parking lot, he saw a temporary registration sticker properly displayed in the rear window of the defendant's car. Officer Dykema radioed in that he had seen the

defendant pull in to the gas station, and he asked the dispatcher to check if there were any warrants outstanding against the defendant. Officer Dykema believed that there might be an arrest warrant for the defendant, because sometime during the previous week, he had checked with the Stephenson County sheriff's office and the police department for outstanding warrants, and one of the two showed a warrant for the defendant. He believed that the warrant was for an ordinance violation for "some type of animal charge, failure to vaccinate an animal."

Officer Dykema entered the store, called the defendant's name, and waited until the defendant finished paying for his items. Officer Dykema then spoke with the defendant and told the defendant that there was a warrant out for his arrest. The defendant told Officer Dykema that he had paid the warrant a few days earlier. While Officer Dykema and the defendant were in the store, and before Officer Dykema received a response from the dispatcher regarding the warrant, Officer Dykema handcuffed the defendant. He testified that he did this because, in his experience, a person would often flee when told there was a warrant for his or her arrest, even if the warrant was not valid. Officer Dykema testified that if the dispatcher had told him that the warrant was no longer valid, he would have released the defendant. Officer Dykema advised the defendant that, after he arrived at the police station, he could call someone to bring in the papers to confirm the payment. He estimated that he and the defendant waited in the store for approximately five minutes before the dispatcher responded.

Officer Dykema also thought it possible that the defendant was driving with a revoked or suspended license, because he knew that the defendant had been arrested for driving without a valid license on five occasions in the last year or two. However, "it had been a while" and Officer Dykema did not know the status of the defendant's driver's license at the time. In testifying, Officer Dykema described the warrant as the reason he detained the defendant in the store.

When the dispatcher responded to Officer Dykema's warrant check, she told him that there was an active warrant for the defendant's arrest and that the defendant's driver's license was revoked. Officer Dykema had called for backup, and police officer Michael Thompson arrived in a marked squad car. Officer Dykema searched the defendant, finding $60 in cash, and then placed the defendant in the backseat of Officer Thompson's squad car to go to the police station. (The defendant could not be transported in an unmarked car such as the one driven by Officer Dykema.)

After the defendant was transported to the police station, someone approached Officer Dykema and handed him the keys to the defendant's car. Officer Dykema searched the passenger compartment of the defendant's car, but not the trunk. In the ashtray, which was closed, he found a knotted plastic baggie containing a substance eventually identified as cocaine and another "jewelry-type" bag containing material later identified as marijuana. Officer Dykema then moved the car from the gas pump to a location in the gas station parking lot. Officer Dykema testified that he moved the defendant's car and parked it in the gas station lot "at [the defendant's] request and at the consent of the owner of the gas station," meaning that the ultimate location of the car was considered suitable by the defendant and the gas station owner. Officer Dykema did not tell the defendant that he was going to search the car.

Officer Thompson also testified at the suppression hearing. He was notified that the defendant was at the Fast Stop and that there might be a warrant for the defendant's arrest, and he was asked to provide backup. He drove to the Fast Stop and met with Officer Dykema and the defendant. He heard the dispatcher say that there was a warrant for the defendant's arrest and that the defendant's license was suspended or revoked. He drove the defendant to the police station and served the warrant, which was sitting on a file cabinet, on the defendant. He did not conduct his own check of the warrant's validity. When he was asked if the police have access to the files of the clerk of the circuit court of Stephenson County, he stated that they do not.

The trial court took judicial notice that on Wednesday, November 8, 2006, bond was posted on the warrant for the defendant's arrest, which was based on a municipal ordinance violation for failure to properly vaccinate an animal. After that date, the warrant was no longer valid, and thus it was not valid at the time of the arrest two days later.

At the close of the suppression hearing, the trial court stated that it would take the matter under advisement and would be looking at the case law in the meantime. The following day, the hearing resumed, with both parties providing further oral argument. The State argued that there was probable cause to arrest the defendant, based both on the warrant and on the revoked driver's license, and that Officer Dykema's search of the defendant's car was justified as a search incident to arrest. The defendant argued that the evidence showed that Officer Dykema relied solely on the warrant in arresting the defendant; that the arrest lacked probable cause because the warrant was not valid; and that even if the arrest were valid, the search was

not within the permissible scope of a search incident to arrest, because the defendant was not near the car at the time of the arrest and was already in the backseat of the squad car when the search took place.

The trial court found that the police officers were credible and that Officer Dykema's testimony established that he had approached and arrested the defendant because of the warrant, and not based on the possibility that the defendant had been driving with a revoked license. The trial court held that, under case law, including *People v. Joseph*, 128 Ill. App. 3d 668 (1984), an invalid arrest warrant does not provide probable cause for arrest. The trial court therefore granted the defendant's motion to suppress the physical evidence. After the State unsuccessfully moved for reconsideration, the State filed a timely appeal. *People v. Marker*, 233 Ill. 2d 158, 176-77 (2009).

## ANALYSIS

In reviewing a trial court's grant of a motion to suppress, we defer to the trial court's findings of fact and will reverse them only if they are against the manifest weight of the evidence. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). However, we review *de novo* the trial court's ruling on the ultimate issue of whether the evidence should be suppressed. *Cosby*, 231 Ill. 2d at 271. Here, the facts are undisputed and the parties do not challenge the trial court's assessment of the credibility of the police officers who testified. The sole issue is whether those facts warranted suppression of the physical evidence. Accordingly, our review is *de novo*.

In this case, the State justified Officer Dykema's search of the defendant's car solely on the basis that it was a search incident to arrest. In order for the State to justify the search on this basis, it must show both that (1) there was a valid arrest (see *People v. Turnage*, 162 Ill. 2d 299, 311 (1994) (if an arrest violates the fourth amendment, evidence discovered through a search incident to arrest is subject to suppression)), and (2) the search was a valid search incident to the arrest (see *People v. Stehman*, 203 Ill. 2d 26, 39 (2002) (if a vehicle search exceeds the boundaries of a proper search incident to arrest, evidence found in the search should be suppressed)). We examine each of these contentions in turn.

## I. The Arrest

The State argues that the arrest was supported by probable cause for several reasons. It first argues that, under the circumstances of this case, the fact that the warrant had been paid two days before the arrest did not render the arrest improper. Alternately, the State contends that probable cause existed because at the time of the arrest Officer Dykema knew that the defendant had been driving and that

his license was revoked. This contention in turn rests on a further argument: that Officer Dykema's detention of the defendant in the store (using handcuffs) should be viewed not as an arrest but merely as an investigatory stop, and that the defendant was not arrested until he was placed in the back of Officer Thompson's squad car and was read his *Miranda* rights, which occurred after the police officers had already received verification of the warrant and the revoked driver's license. We address each of these arguments separately, taking the second argument first.

## A. *Nature of the Detention in the Store, or When Did the Arrest Occur?*

One contention underlying several of the State's arguments is that the encounter between Officer Dykema and the defendant escalated over time from an investigatory stop to an arrest and was adequately justified at all times. Under the State's view, Officer Dykema had reasonable suspicion to detain the defendant in the store until he could ascertain whether there was an active warrant for the defendant, because he had seen the defendant's name on a warrant list earlier in the week. According to the State, this detention was merely a brief investigatory stop, and the defendant was not actually arrested until he was placed in Officer Thompson's squad car, after Officer Dykema received the response from the dispatcher. At that point, the State argues, Officer Dykema had probable cause to arrest the defendant because the dispatcher had verified the warrant and also stated that the defendant's driver's license was revoked.

We agree that a brief detention in order to determine whether there is an arrest warrant for the person detained may ordinarily be categorized as an investigatory stop and does not violate the fourth amendment so long as the officer has reason to believe that such a warrant exists. However, Officer Dykema testified that he handcuffed the defendant before the dispatcher responded. The defendant argues that he was arrested when Officer Dykema put the handcuffs on him in the store and that there was no probable cause for the arrest at that point. Our analysis therefore begins with the nature of the defendant's detention inside the store and when the arrest occurred.

In *United States v. Smith*, 3 F.3d 1088 (7th Cir. 1993), the Seventh Circuit summarized the general principles applicable to seizures:

> "The Fourth Amendment [(U.S. Const., amend. IV)] guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' Searches and seizures ' "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifi-

cally established and well delineated exceptions." ' *Thompson v. Louisiana*, 469 U.S. 17, 19-20[, 83 L. Ed. 2d 246, 250, 105 S. Ct. 409, 410] (1984) (per curiam) (quoting *Katz v. United States*, 389 U.S. 347, 357[, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967)] (footnotes omitted). *Terry v. Ohio*[, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968),] was one such exception." *Smith*, 3 F.3d at 1096-97.

Under *Terry*, a police officer may briefly detain a person, whom the officer reasonably suspects to be recently or currently engaged in criminal activity, in order to verify or dispel those suspicions. *Smith*, 3 F.3d at 1095. A *Terry* stop may be performed without a warrant or probable cause to arrest, if this standard of reasonable suspicion is met and if the stop does not exceed the bounds of a brief investigatory detention. *Smith*, F.3d at 1097. "The purpose of permitting a temporary detention without probable cause *** is to protect police officers and the general public." *Smith*, 3 F.3d at 1097, citing *Terry*, 392 U.S. at 25-26, 20 L. Ed. 2d at 908, 88 S. Ct. at 1882.

■ In this case, Officer Dykema testified to his belief that, in detaining the defendant in the store while he checked to see whether there was a warrant for the defendant's arrest, he was performing a brief investigatory stop under *Terry*. The defendant argues that, whatever Officer Dykema's intent, his use of handcuffs to restrain the defendant shows that the detention was an arrest. Although the trial court did not address this issue directly, it implicitly rejected the State's argument that the detention in the store was not an arrest when it found that the only reason Officer Dykema arrested the defendant was his belief that there was a warrant. If the trial court had believed that the arrest took place after the dispatcher informed Officer Dykema about the warrant and the fact that the defendant's driver's license was revoked, there would have been a valid basis for the arrest separate from the warrant. In reviewing this determination, we defer to the trial court's finding that Officer Dykema testified credibly regarding his reasons for stopping the defendant, but review *de novo* its implicit legal conclusion that the defendant was arrested when he was handcuffed. *Cosby*, 231 Ill. 2d at 271.

"[T]here is no bright-line test for distinguishing between a lawful *Terry* stop and an illegal arrest." *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir. 1989). However, the use of handcuffs to restrain the person being detained is an indication that the detention is an arrest rather than a *Terry* stop. "[H]andcuffs are restraints on freedom of movement *normally* associated with arrest." (Emphasis in original.) *Glenna*, 878 F.2d at 972; see also *People v. Gabbard*, 78 Ill. 2d 88, 93 (1979) (noting that "the State admits that [the defendant's] handcuff-

ing constituted an arrest, and we agree"). The use of handcuffs substantially heightens the intrusiveness of a temporary detention (*Glenna*, 878 F.2d at 972) and "is not part of a typical *Terry* stop" (*Washington v. Lambert*, 98 F.3d 1181, 1188 (9th Cir. 1996)). The Seventh Circuit has called "troubling" the prospect of police officers handcuffing persons whom they have no probable cause to arrest. *Glenna*, 878 F.2d at 972.

Nevertheless, there are situations in which concerns for the safety of the police officer or the public justify handcuffing the detainee for the brief duration of an investigatory stop. For instance, where police stopped a car containing three suspects in an armed robbery that occurred a few minutes before, it was reasonable to believe that the suspects were armed and dangerous, and concerns for officer safety supported the use of handcuffs during the investigatory stop. *People v. Walters*, 256 Ill. App. 3d 231, 238 (1994). Similarly, the "risks inherent in interdicting drug traffic may warrant the use of handcuffs in investigatory stops" for drug offenses, where the suspect is in a motor vehicle. *People v. Nitz*, 371 Ill. App. 3d 747, 754 (2007), citing *People v. Waddell*, 190 Ill. App. 3d 914, 927 (1989). In those circumstances, the use of handcuffs does not by itself convert a *Terry* stop into an arrest, and the fact that handcuffing takes place before an officer has probable cause to arrest is not an automatic violation of the fourth amendment. *Nitz*, 371 Ill. App. 3d at 754; *Walters*, 256 Ill. App. 3d at 237; *Smith*, 3 F.3d at 1094; *Glenna*, 878 F.2d at 973. However, "when arrest-like measures (such as handcuffing) are employed, they must be ' "reasonable in light of the circumstances that prompted the stop or that developed during its course." ' " *Nitz*, 371 Ill. App. 3d at 754, quoting 4 W. LaFave, Search & Seizure §9.2 (d), at 304 (4th ed. 2004), quoting *United States v. Acosta-Colon*, 157 F.3d 9, 15 (1st Cir. 1998). If the use of such restraints is not reasonably necessary for safety under the specific facts of the case, their use will indicate that the encounter should be viewed as an arrest. See *People v. Calderon*, 336 Ill. App. 3d 182, 192 (2002) (in determining whether a detention was a *Terry* stop or an arrest, courts must consider the totality of the circumstances, one relevant factor being the use of such restraints).

Here, Officer Dykema testified that he handcuffed the defendant while detaining him inside the store because "other people in the past[,] when they find out they have an arrest warrant and they know they are possibly going to be arrested[,] they try and run." However, in the absence of any evidence that the defendant was actually preparing to flee, Officer Dykema's past experience with arrests pursuant to warrants was insufficient as a basis for handcuffing. The State argues that the handcuffing to prevent flight was also supported by Officer

Dykema's belief that, before pulling into the gas station, the defendant had been driving in a manner suggesting that he was attempting to evade pursuit. We reject this argument because any reliance on the defendant's earlier driving manner as being suggestive of flight was objectively unreasonable in light of subsequent events: the defendant parked at a gas station, entered a store, and remained there for several minutes, even after Officer Dykema entered the store and called his name. These actions clearly suggested that the defendant was *not* a flight risk, regardless of Officer Dykema's suspicions about his earlier driving. The law is clear that the determination that handcuffs or other forms of restraint were reasonable and necessary must be based on the totality of the circumstances actually confronting the officer, not on generalizations or remote possibilities.

> "In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, *i.e.*, the aggressiveness of the police methods and how much the [detainee's] liberty was restricted, [citation], and the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. [Citation.] In short, we decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*." (Emphasis in original.) *Lambert*, 98 F.3d at 1185.

See also *Acosta-Colon*, 157 F.3d at 18-19 ("when the government seeks to prove that an investigatory detention involving the use of handcuffs did not exceed the limits of a *Terry* stop, it must be able to point to *some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm" (emphasis in original)).

In this case, Officer Dykema did not suggest that, once he was in the store, the defendant made any attempt to resist or evade detention, or posed any risk to public safety. Rather, his testimony suggests that the defendant was compliant and cooperative throughout the encounter. Officer Dykema's testimony also established that he was familiar with the defendant and knew him by name, suggesting that it might not be difficult to re-apprehend him even if he did flee. Moreover, as the defendant points out, Officer Dykema knew that the offense for which the warrant was issued was a minor municipal ordinance violation for failure to innoculate an animal, not a crime of violence or a drug-trafficking offense of the type that we have held sufficient to justify the use of handcuffs during an investigatory stop.

See *Nitz*, 371 Ill. App. 3d at 754. In short, nothing about the facts of this case demonstrates that the use of handcuffs was reasonably necessary.

As discussed, the use of handcuffs during a detention is a relatively severe restriction on a person's freedom of movement. The State has not identified any specific fact or circumstance that would justify the handcuffing of the defendant in this case for the purposes of an investigatory stop, and we therefore hold that the defendant was arrested at the moment he was handcuffed in the store. We turn to the issue of whether there was probable cause to arrest the defendant at that point, which was before the dispatcher provided Officer Dykema with confirmation of the warrant and information that the defendant's driver's license was revoked.

### B. *Probable Cause for Arrest*

The State argues that, in this case, the fact that the warrant ultimately proved to be invalid at the time of the arrest should not render the arrest itself invalid for lack of probable cause, because this case is distinguishable from the cases upon which the trial court relied in suppressing the physical evidence. The State contends that where, as here, the warrant was paid only two days[1] before the arrest and there was no evidence that the police themselves were the cause of the incorrect information regarding the warrant, the arrest should not have been quashed. Without resolving this issue, we affirm the trial court's finding that there was no probable cause for a different reason: even if the dispatcher's confirmation of the warrant could be viewed as providing probable cause to arrest the defendant, Officer Dykema did not wait for the confirmation before arresting the defendant, and thus he did not have probable cause at the time the arrest was made.

In *Whiteley v. Warden*, 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971), the Supreme Court held that a police officer is entitled to rely on information that a warrant exists for a defendant's arrest and to assume that it is valid. Where, however, it is later discovered that the warrant is invalid, any evidence seized pursuant to the illegal arrest is subject to suppression. *Whiteley*, 401 U.S. at 568-69, 28 L. Ed. 2d at 313, 91 S. Ct. at 1037. Illinois courts have applied *Whiteley* to suppress evidence in a variety of cases in which the warrant was found, after the arrest, to be invalid. See *Turnage*, 162 Ill. 2d at 311; *People v.*

---

[1]The State asserts that on the date of the arrest, November 10, 2006, government offices were closed in observance of Veterans Day. Although the defendant did not respond to the assertion, the record contains no evidence regarding this factual issue, and we have insufficient independent corroboration of the State's assertion to take judicial notice of it.

*Morgan*, 388 Ill. App. 3d 252, 260 (2009); *People v. Boyer*, 305 Ill. App. 3d 374, 380-81 (1999); *People v. Anderson*, 304 Ill. App. 3d 454, 459 (1999); *People v. Joseph*, 128 Ill. App. 3d 668, 673 (1984); *People v. Decuir*, 84 Ill. App. 3d 531, 533 (1980). The rationale for suppression is that, where the evidence supports the conclusion that stale information regarding a warrant was within the power of the police to remedy through prompt updating of records, it is not appropriate to allow "law enforcement authorities to rely on an error of their own making." *Joseph*, 128 Ill. App. 3d at 672 (suppressing evidence where arrest warrant had been recalled 11 days earlier).

There is some tension between this rationale for suppression and the good-faith exception to the exclusionary rule. The good-faith exception was outlined in *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), and it applies when a police officer reasonably relies on a facially valid warrant that is later shown to be invalid: under those circumstances, although a search violates the fourth amendment, the deterrent purposes of the exclusionary rule do not necessarily require suppression of the evidence acquired through the illegal search. *Leon*, 468 U.S. at 913, 82 L. Ed. 2d at 692, 104 S. Ct. at 3415. *Leon* does not directly control the outcome here, because in *Leon* the police officer was relying on the warrant itself, whereas in cases such as this one, the issue is whether a police officer may reasonably rely on information from another police department employee that there is an arrest warrant for the defendant.

In *Herring v. United States*, 555 U.S. 135, 172 L. Ed. 2d 496, 129 S. Ct. 695 (2009), the Supreme Court addressed the issue left open in *Leon* and held that, where a police officer arrests a defendant based upon information that there is an active arrest warrant, but the warrant is later determined to have been invalid or recalled, the good-faith exception to the exclusionary rule may apply. In *Herring*, a Coffee County, Alabama, investigator saw the defendant (who was known to him from previous encounters) and called the Coffee County warrant clerk to check for any outstanding warrants on the defendant. The clerk found none, and the investigator asked her to check with her counterpart in neighboring Dale County. The Dale County clerk checked her database and found that there was an active arrest warrant for the defendant. Upon hearing this, the Coffee County investigator promptly pulled the defendant over and arrested him. In searching the defendant incident to the arrest, the investigator found methamphetamine in his pocket and a gun in his car. During the brief span of time (10 to 15 minutes) in which the arrest occurred, however, the Dale County warrant clerk discovered that the computer records showing the warrant for the defendant were incorrect and that the warrant

had been recalled five months earlier. She immediately telephoned the Coffee County warrant clerk, who notified the investigator that the warrant was not valid. However, the investigator had already arrested the defendant and completed the search. *Herring*, 555 U.S. at 138, 172 L. Ed. 2d at 502-03, 129 S. Ct. at 698. The evidence at the suppression hearing showed that errors in the warrant database were extremely rare; neither warrant clerk could remember a similar mistake occurring in the past. *Herring*, 555 U.S. at 147, 172 L. Ed. 2d at 508, 129 S. Ct. at 704. The Supreme Court held that, under these circumstances, the police were at most negligent, and the deterrent purposes of the exclusionary rule would not be well served by suppressing the evidence found during the search. *Herring*, 555 U.S. at 146, 172 L. Ed. 2d at 509, 129 S. Ct. at 704. The Supreme Court was careful, however, to leave open the possibility that the exclusionary rule could be applied if the actions of the police rose above the level of ordinary negligence, or if the warrant database were found to contain errors on a regular basis or in a manner suggesting systemic disregard for the accuracy of the information. *Herring*, 555 U.S. at 145-46, 172 L. Ed. 2d at 508, 129 S. Ct. at 703.

Here, the trial court expressly relied on *Joseph* in granting suppression, but that case predated *Herring* and, like *Anderson*, simply dismissed the good-faith exception as inapplicable to arrests based on invalid warrants. Even before *Herring* was decided, however, Illinois courts had rejected this blanket approach and instead held that the appropriateness of suppression depends on the reason for the invalidity of the warrant in the case before the court. See, *e.g., Boyer*, 305 Ill. App. 3d at 378-79. *Morgan*, 388 Ill. App. 3d at 263-67, which was decided after *Herring*, continued this approach, looking to whether the facts of the case justified suppression. There, the court examined the application of *Herring* to a case sharing some key factual similarities with this case. As we believe that the analysis in *Morgan* is applicable here, we present it in some detail.

In *Morgan*, a sheriff's deputy obtained a Streator police department warrant list containing Morgan's name and address. Unlike warrant lists the deputy had obtained in the past, the list was not printed out in his presence on the same day he received it. The deputy and a Fairbury police officer met up with another deputy and within about five minutes they arrived at Morgan's residence. When they informed Morgan's father that there was a warrant for Morgan's arrest, he told them that he had bailed Morgan out of jail that morning and had paperwork to prove it. As he was getting the paperwork, the police entered the residence and arrested Morgan. Someone provided the officers with the paperwork showing that the warrant had been paid.

One of the deputies called the sheriff's communications center, which confirmed that the warrant was no longer active. The officers uncuffed Morgan, but then searched the bedroom where he was arrested and found some rock cocaine. According to the officers, when they questioned Morgan about it, he said it was his and then voluntarily showed them additional cocaine and drug paraphernalia including a crack pipe and a marijuana pipe. At no point during any of these events did the police give Morgan any *Miranda* warnings. Morgan was charged with possession of a controlled substance and two counts of possession of drug paraphernalia, and he filed a motion to suppress. The trial court granted the motion on the basis that the warrant was invalid and that therefore suppression of the items discovered after the arrest was required. *Morgan*, 388 Ill. App. 3d at 258.

The appellate court affirmed the suppression, but on a different ground. The appellate court agreed that "evidence obtained as a result of an inactive warrant is subject to suppression" because an arrest made without a warrant or any other source of probable cause to arrest violates the fourth amendment. *Morgan*, 388 Ill. App. 3d at 260. However, the court noted that not every fourth amendment violation requires the suppression of evidence. Under the good-faith exception to the exclusionary rule, evidence need not be suppressed if (1) the actions of the police were objectively reasonable; (2) suppression will not have an appreciable deterrent effect on police misconduct; and (3) the benefits of suppression do not outweigh the costs of excluding the evidence. *Morgan*, 388 Ill. App. 3d at 260-61 (citing *Leon* and *Herring*). The appellate court held that the trial court therefore erred in suppressing the evidence without considering whether this good-faith exception to the exclusionary rule applied. *Morgan*, 388 Ill. App. 3d at 263.

Nevertheless, the appellate court in *Morgan* held that suppression was proper under the three-factor test applied in *Herring*. The first factor, the objective reasonableness of the police action, was not met because the officers knew that their warrant list was up to three days old, and yet they made no attempt to verify that the warrant was active before going to Morgan's home, entering, and arresting him. The court noted that, upon calling the communications center, the deputy was immediately able to find out that the warrant was not active, and the court stated that there was no reason why the officers could not have done so earlier. The court found that the second factor, the deterrent effect of suppression, also weighed in favor of suppression, because suppression would penalize the same persons guilty of the misconduct—the officers who knowingly relied on an out-of-date warrant list without verifying that the warrant was still active. Finally,

the court determined that the benefits outweighed the costs because exclusion of the evidence would have a strong deterrent effect. *Morgan*, 388 Ill. App. 3d at 265-66.

The court distinguished the circumstances from those in *Herring*, because in *Herring* the arresting officer had no reason to think that the warrant information on which he relied was out of date. By contrast, in *Morgan*, the officers were aware that their warrant list was not current and yet took no steps prior to the arrest to ensure that the warrant was still valid. "This is the type of 'reckless disregard' the Supreme Court noted would justify the exclusion of the evidence." *Morgan*, 388 Ill. App. 3d at 267, citing *Herring*, 555 U.S. at 147, 172 L. Ed. 2d at 509, 129 S. Ct. at 704.

■ The facts in the case before us are not as egregious as those in *Morgan*, yet they are similar in one compelling respect: in both cases, the arresting officer was aware that he did not possess current warrant information, and yet he proceeded with the arrest before confirming the validity of the warrant. Officer Dykema conceded that he knew only that he had seen the defendant's name on a warrant list sometime in the past week. That in itself did not provide him with probable cause to arrest. Although Officer Dykema called the dispatcher to verify the status of the warrant before entering the store, he did not wait for the response before deciding to handcuff the defendant. As noted above, Officer Dykema's act of handcuffing the defendant constituted an arrest. Thus, regardless of the accuracy of the information eventually provided to Officer Dykema about the status of the warrant, Officer Dykema lacked probable cause at the time of the arrest.

In proceeding to the second part of the analysis—whether the facts of the fourth amendment violation at issue support suppression—we conclude that they do. Here, as in *Morgan*, Officer Dykema's decision to proceed with handcuffing the defendant, despite the lack of confirmation that there was an active arrest warrant for the defendant, went beyond mere negligence and constituted reckless disregard. Such a decision is the type that can be deterred by suppression of evidence. See *Morgan*, 388 Ill. App. 3d at 265 ("the officers' reliance on an up-to-three-day-old warrant list is conduct that can be deterred"). Finally, the benefits of suppression outweigh the costs, in that the need to deter police from handcuffing a citizen without confirming whether there is a valid warrant for his arrest outweighs the costs of hindering the State from prosecuting this particular defendant. Thus, the good-faith exception to the exclusionary rule does not apply here, and the evidence was properly suppressed.

The State also argues that, apart from the warrant, Officer Dykema had probable cause to arrest the defendant for driving while his driver's license was revoked. We must reject this argument in light of our holding that the defendant was arrested before the dispatcher provided Officer Dykema with any information, as Officer Dykema conceded that he did not know the status of the defendant's license at the time he handcuffed the defendant in the store. Accordingly, the defendant's arrest cannot be justified on the basis that the police had probable cause to believe that his license was revoked.

In sum, the police initiated the arrest before obtaining probable cause to believe either that there was a valid warrant for the defendant or that his license was revoked, and under the *Herring* suppression analysis the evidence gained from the search incident to arrest was properly suppressed. Even if suppression were not justified based on the invalidity of the arrest, however, we would still affirm the trial court's suppression order because the search performed by Officer Dykema was not a valid search incident to arrest.

## II. The Search of the Car

The sole justification offered by the State for the search of the defendant's car was that it was a search incident to arrest. If the search of the defendant's car was beyond the permissible scope of a search of a vehicle pursuant to arrest, then the trial court was correct to suppress the evidence obtained through that search. See *Stehman*, 203 Ill. 2d at 38-39. In making this determination, we look to cases interpreting the fourth amendment to the United States Constitution (U.S. Const., amend. IV), both because the parties have not raised any arguments under the corresponding search and seizure provision of the Illinois Constitution (Ill. Const. 1970, art. I, §6), and because Illinois follows federal law on fourth amendment issues in "limited lockstep" (*People v. Caballes*, 221 Ill. 2d 283, 313 (2006)).

The permissible scope of a vehicle search incident to arrest has varied over the years. The Supreme Court first held that police may conduct a search incident to arrest of an arrestee's person and the area within his immediate control, in *Chimel v. California*, 395 U.S. 752, 763, 23 L. Ed. 2d 685, 694, 89 S. Ct. 2034, 2040 (1969). Such a search is justified for the purposes of (1) protecting the safety of arresting officers, and (2) preventing the destruction or concealment of evidence related to the offense of arrest. *Chimel*, 395 U.S. at 763, 23 L. Ed. 2d at 694, 89 S. Ct. at 2040. The scope of the search is limited by these justifications to the area within the arrestee's immediate control, meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763, 23 L. Ed. 2d at 694, 89 S. Ct. at 2040.

In *New York v. Belton*, 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860 (1981), the Supreme Court applied *Chimel* to a situation in which the defendant was stopped while traveling in an automobile. Citing the need for a bright-line rule to guide police, the Court held that in such a situation the police could search the automobile's passenger compartment as well as any containers found therein. *Belton*, 453 U.S. at 460, 69 L. Ed 2d at 775, 101 S. Ct. at 2864.

The question then arose whether *Belton* permitted police to search a car even when the arrestee was some distance from the car at the time of arrest. Illinois courts first held that such searches were permitted under *Belton* (see *People v. Bailey*, 159 Ill. 2d 498, 506 (1994); *People v. Kalivas*, 207 Ill. App. 3d 415, 417-18 (1991)) but then concluded that they were not (see *Stehman*, 203 Ill. 2d at 39).

The Supreme Court most recently revisited this area of law in *Arizona v. Gant*, 556 U.S. 332, 173 L. Ed. 2d 485, 129 S. Ct. 1710 (2009). In that case, Gant had gotten out of his vehicle and walked 10 to 12 feet away from it when he was arrested for driving with a suspended license. Once Gant was handcuffed and placed in the back of a squad car, the police searched his car and found a gun and cocaine. The Supreme Court held that the scope of a permissible automobile search could not be divorced from the two rationales for a search enunciated in *Chimel*: the safety of the arresting officer and the preservation of evidence relating to the crime for which the defendant was arrested. *Gant*, 556 U.S. at 343, 173 L. Ed. 2d at 496, 129 S. Ct. at 1719. Thus, the police may search a vehicle incident to arrest only: (1) where there is a reasonable possibility that the arrestee could gain access to the vehicle, that is, "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"; or (2) when it is " 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' " *Gant*, 556 U.S. at 343, 173 L. Ed. 2d at 496, 129 S. Ct. at 1719, quoting *Thornton v. United States*, 541 U.S. 615, 632, 158 L. Ed. 2d 905, 920, 124 S. Ct. 2127, 2137 (2004) (Scalia, J., concurring in the judgment, joined by Ginsburg, J.). The Court specifically rejected the second possibility in the context of arrests for traffic offenses, stating that in such cases, "there will be no reasonable basis to believe the vehicle contains relevant evidence." *Gant*, 556 U.S. at 343, 173 L. Ed. 2d at 496, 129 S. Ct. at 1719. Noting that Gant had been arrested for a traffic violation and that the "police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein," the Court affirmed the reversal of the defendant's conviction. *Gant*, 556 U.S. at 344, 173 L. Ed. 2d at 497, 129 S. Ct. at 1719.

■ In the case before us, it is undisputed that the defendant left his car several minutes before he was arrested and that he had already been handcuffed and placed in the back of the squad car when Officer Dykema conducted his search of the defendant's car. Thus, he was not within reaching distance of his car at the time of the search. Nor could any evidence relevant to either of the putative bases for the arrest— the warrant for failure to innoculate an animal or the traffic violation of driving while his license was revoked—reasonably be expected to be found in the car. In these circumstances, there was no justification for the search of the defendant's car (*Gant*, 556 U.S. at 344, 173 L. Ed. 2d at 497, 129 S. Ct. at 1719), and the physical evidence produced by the illegal search was properly suppressed.

The State raises one last argument through a post-briefing motion, contending that *Gant* changed the law with respect to vehicle searches incident to arrest and that the good-faith exception to the exclusionary rule applies because Officer Dykema reasonably believed that his search of the defendant's car did not violate the fourth amendment. In support, the State cites *United States v. Peltier*, 422 U.S. 531, 45 L. Ed. 2d 374, 95 S. Ct. 2313 (1975), in which the Supreme Court held that the exclusionary rule should not be applied to a case in which a new principle of constitutional law is announced, where the new principle is a "clean break" from prior law and the officer relied in good faith on prior law when conducting the search. We reject this argument for two reasons. First, as the Illinois Supreme Court has noted, *Peltier* was overturned a little over a decade later by *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987), in which the Supreme Court held that new constitutional rules should be applied to pending criminal cases. *People v. Harris*, 123 Ill. 2d 113, 130 (1988). Indeed, the Supreme Court rejected a similar argument in *Gant* itself. In his dissent, Justice Alito argued that *Gant*'s holding would unfairly upend the reasonable reliance of police on *Belton*, noting, "It is likely that, on the very day when this opinion is announced, numerous vehicle searches will be conducted in good faith by police officers who were taught the *Belton* rule." *Gant*, 556 U.S. at 359, 173 L. Ed. 2d at 506, 129 S. Ct. at 1728 (Alito, J., dissenting, joined by Roberts, C.J., and Kennedy and Breyer, JJ.). The majority rejected this concern, stating, "The fact that the law enforcement community may view the State's version of the *Belton* rule as an entitlement does not establish the sort of reliance interest that could outweigh the countervailing interest that all individuals share in having their constitutional rights fully protected." *Gant*, 556 U.S. at 349, 173 L. Ed. 2d at 500, 129 S. Ct. at 1723. The Court then applied the new rule it was announcing in the case before it, affirming the Arizona Supreme Court's reversal of Gant's conviction.

Second, to the extent that Officer Dykema could be characterized as acting in reliance upon pre-*Gant* law when he searched the defendant's car in November 2006, he should have known that his search was illegal. In 2002, the Illinois Supreme Court foreshadowed the *Gant* decision when it held that, where a defendant has voluntarily left his vehicle and begun walking away from it when he is arrested, a police search of his vehicle cannot be justified as a search incident to arrest absent concerns about officer safety or the preservation of evidence relating to the offense for which he was arrested. *Stehman*, 203 Ill. 2d at 38. Although lower Illinois courts later debated whether the Illinois Supreme Court would overrule *Stehman* in light of the Supreme Court's 2004 decision in *Thornton* (see *People v. Neff*, 369 Ill. App. 3d 358 (2006); *People v. Dieppa*, 357 Ill. App. 3d 847 (2005)), *Stehman* remained the law of Illinois at the time of the arrest. Thus, even if we could discern a proper legal foundation for the State's requested extension of the good-faith exception, there would be no basis to apply it here.

## CONCLUSION

For all of the foregoing reasons, the order of the circuit court of Stephenson County is affirmed.

Affirmed.

McLAREN, J., concurs.

PRESIDING JUSTICE ZENOFF, specially concurring:

After a detailed and careful analysis of the circumstances surrounding defendant's arrest, the majority concludes that even if suppression of the evidence seized from defendant's vehicle was not justified based on the invalid arrest, it would still affirm the trial court's suppression order because the search performed by Officer Dykema was not a valid search incident to arrest. I concur that under the facts here and pursuant to *Arizona v. Gant*, 556 U.S. 332, 173 L. Ed. 2d 485, 129 S. Ct. 1710 (2009), there was no justification to search defendant's car and thus the trial court properly suppressed the physical evidence recovered. I would accordingly limit our opinion to the analysis of this issue alone.